# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 426 | **DATE** | 7/16/2001 |
| **CASE TITLE** | Erickson vs. Baxter, et al. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motions to bar Drs. Mosley and London are denied in part and granted in part. Both parties motions to strike certain exhibits are denied. Defendants' motion for summary judgment is denied as to all claims against Baxter; granted as to all claims against Armour; and granted as to the hepatitis claims and denied as to the HIV claims against Bayer. Accordingly, defendant, Armour Pharmaceutical Company is dismissed from this action. Response to any motions in limine will be due by 8/3/01. Pretrial conference set for 11/9/01 at 2:00 p.m. Trial will be set at that time. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 8 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | docketing deputy initials | 173 |
| | Mail AO 450 form. | 7/16/2001 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| MPJ | courtroom deputy's initials | Date/time received in central Clerk's Office | MPJ mailing deputy initials |

FILED FOR DOCKETING

01 JUL 16 PH 6: 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARIA ERICKSON, Individually and )
as Personal Representative of )
the Estate of Walter Erickson, )
Deceased, )
                          )
        Plaintiff, )
                          )
    v. )   No. 99 C 0426
                          )
BAXTER HEALTHCARE, INC., a )
foreign corporation; BAYER )
CORPORATION, a foreign )
corporation; ARMOUR PHARMACEUTICAL )
COMPANY, a foreign corporation; )
ALPHA THERAPEUTIC CORPORATION, )
a foreign corporation; and )
NATIONAL HEMOPHILIA FOUNDATION, )
                          )
        Defendants. )

### MEMORANDUM OPINION AND ORDER

Walter Erickson was a hemophiliac who received intravenous transfusions of commercial blood factors. He contracted HIV and Hepatitis C, and he sued on the HIV claims in the Circuit Court of Cook County, Illinois, on March 23, 1993. The Cook County action was terminated after Mr. Erickson became a named class representative in a case filed in this court, *Waldleigh v. Rhone-Poulenc Rorer*, No. 93 CV 5969 (N.D. Ill. filed Sept. 30, 1993). On December 9, 1998, Judge Grady ordered Mr. Erickson's claims severed from the *Waldleigh* case and ordered a new complaint to be filed. Mr. Erickson died on December 27, 1998. Judge Grady extended the time to file a new complaint to February 3, 1999, and on January

29, 1999, Ms. Erickson, Mr. Erickson's surviving spouse, filed this action, alleging jurisdiction under 28 U.S.C. § 1332. She brings survival and wrongful death claims against Baxter Healthcare, Inc. ("Baxter"), Armour Pharmaceutical Co. ("Armour"), and Bayer Corp. ("Bayer").[1] She claims that the factor concentrates that Mr. Erickson received were manufactured by the defendants and were infected with Hepatitis C and HIV and caused his infection with those viruses. The defendants move for summary judgment, claiming that Ms. Erickson cannot establish negligence, or in the alternative, that her actions are barred by the statute of limitations. They also move to bar certain opinions of plaintiff's experts. The motions to bar are granted in part and denied in part. The motion for summary judgment is granted as to Armour and Bayer and denied as to Baxter on the claims arising out Mr. Erickson's hepatitis C infection. It is granted as to Armour and denied as to Bayer and Baxter on the claims arising out of his HIV infection. The cross motions to strike exhibits are denied.

I.

When Mr. Erickson was eight years old, he was diagnosed with mild hemophilia A, a hereditary illness that inhibits blood clotting and creates a risk of uncontrolled bleeding. Hemophilia

---

[1] The parties have stipulated to the dismissal of Alpha and the National Hemophilia Foundation, and Ms. Erickson has dismissed Counts I-III, and VII against Armour and Bayer. All claims remain against Baxter, and Counts IV-VI and VIII remain against Armour and Bayer.

-2-

can be treated by a transfusion of clotting factors from human blood plasma. As a teenager, Mr. Erickson received intravenous factor concentrates, many of which were manufactured by the defendants. Ms. Erickson's experts opine that, based on the dates of transfusions and the appearance of symptoms, Mr. Erickson became infected with Hepatitis A ("HAV") in 1973, Hepatitis B ("HBV") in 1970, Hepatitis C ("HCV") between November 1976 and April 1977, and HIV in 1981. He tested positive for HIV on March 29, 1991, and for HCV in December 1991. His death certificate says that he died on December 27, 1998, of end stage liver disease due to Hepatitis B and C, and Ms. Erickson claims that his HIV infection accelerated the liver disease due to HCV.

Factor concentrate is a "pooled" product processed from plasma contributed from multiple donors, some of whom are paid or are otherwise at greater risk for dangerous viral infections than the rest of the population. Commercial factor concentrates like the ones manufactured by the defendants present a significantly higher risk of HBV and HCV infection than single-donor cryoprecipitates. From the late 1960s to the early 1980s, according to one of the defendants' experts, the risk of transmission from commercial factor concentrates was 50%, as opposed to 1 to 2% for cryoprecipitate.

The first article suggesting the existence of Hepatitis C (originally identified as non-A non-B, or NANB) was published in

-3-

1974, though no test for the HCV antibody was available until 1990. The parties dispute what the medical community knew about HCV in the 1970s and what the defendants as manufacturers did or could have done to prevent its transmission. The first reported cases of AIDS (caused by HIV) in hemophiliacs were in June 1982. The parties dispute what was known prior to 1982 about the transmission of non-hepatitis, blood-transmitted viruses, particularly HIV, and what the defendants could have done to prevent the transmission of HIV.

## II.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists when there is sufficient evidence that a jury could return a verdict for the non-moving party. *Szymanski v. Rite-Way Lawn Maint. Co., Inc.*, 231 F.3d 360, 364 (7th Cir. 2000). I must construe the facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Evidence opposing a motion for summary judgment, including expert testimony, must be "admissible or usable at trial." *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001).

III.  Statute of Limitations

The defendants argue that all of the survival and wrongful death claims are barred by the statute of limitations.  A survival action is a derivative action, subject to the statute of limitations for the decedent's original claim; here, Mr. Erickson's personal injury claims were subject to the two-year statute of limitations of 735 ILCS 5/13-202. *See Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1029 (Ill. 1996).  For wrongful death actions, the statute of limitations is two years from the decedent's death.  740 ILCS 180/2.  Where a plaintiff does not discover his injury until the limitations period has already run, the discovery rule tolls the running of the statute of limitations until he knows or reasonably should know of his injury and that it was wrongfully caused.  *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135 (Ill. 1995).

Ms. Erickson says that Mr. Erickson did not know he was HIV positive until March 29, 1991, and that he did not know he was HCV positive until December 1991.  The defendants "controvert" the HIV date on the grounds that the test results offered by Ms. Erickson lack a proper foundation.  An objection to lack of foundation is formal, and evidence provided at the summary judgment stage need only be admissible in content, not necessarily in form.  *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994).  Moreover, the date offered is supported by Mr. Erickson's deposition testimony

that he was not tested for HIV until March 1991. Dr. Mitchell, one of Mr. Erickson's treating physicians, also testified that Mr. Erickson had not been tested for HCV as of November 22, 1991, but that he wanted to discuss treatment for HCV on December 28, 1991. A reasonable jury could conclude that Mr. Erickson first learned he was HCV positive sometime in late 1991.

Under the discovery rule, even if Mr. Erickson did not know of his injuries before 1991, the statute of limitations will not be tolled if he should have known. *Hermitage Corp.*, 651 N.E.2d at 1135. Mr. Erickson waited to be tested for HIV because he was in good health and believed that, as a mild hemophiliac with a history of few transfusions, he was not at high risk for HIV. He was also concerned about the stigma and confidentiality problems of testing. The defendants argue that the discovery rule should not apply because Mr. Erickson should have known that he was *at risk* for HIV. But it is knowledge of the injury and that it was wrongfully caused that starts the limitations period running, not knowledge of the mere *risk* of potential for injury. *See id.* The defendants also suggest that, because he knew or should have known he was at risk for HIV, Mr. Erickson had a duty to investigate to discover his HIV status before 1991 and that his failure to do so before then was an "ostrich tactic" tantamount to knowledge. However, there is no duty to be tested for HIV based on membership in a high-risk group; any duty to inquire runs to the knowledge of wrongdoing, not to the

knowledge of injury. *See Young v. McKiegue*, 708 N.E.2d 493, 501 (Ill. App. Ct. 1999). His HIV claims are not time-barred.

Mr. Erickson knew that he was infected with HBV in the 1970s, but he did not discover that he was HCV-positive until 1991. Baxter argues that it is all one hepatitis claim, and Mr. Erickson's HCV infection is merely an unforeseen consequence of his HBV infection, not a separate claim.[2] There are five types of viral hepatitis (A, B, C, D, and E), caused by different viruses with different incubation periods and methods of transmission, and the severity varies according to virus type. *Stedman's Med. Dictionary* 808 (27th ed. 2000). In short, they are different diseases. Therefore, Mr. Erickson's knowledge of his HCV infection is not knowledge of the nature and severity of his known HBV infection; it is a separate claim. *Cf. Golla v. General Motors Corp.*, 657 N.E.2d 894, 900 (Ill. 1995).[3]

## IV. Negligence

The complaint alleges negligent failure to warn physicians of

---

[2] Ms. Erickson does not argue that the defendants were negligent in the transmission of Hepatitis A or B.

[3] The defendants argue for the first time in reply that the HCV claim, first filed in 1999, does not relate back to the HIV claim filed in 1993. Arguments raised first in reply are waived. *United States v. Beltran*, 109 F.3d 365, 371 (7th Cir. 1997). In any event, the HCV claim arises out of the same allegations of negligence as the HIV claims, and the 1993 complaint alleges that the factor concentrates were contaminated with hepatitis, so the HCV claim relates back under Fed. R. Civ. P. 15(c). *See Worthington v. Wilson*, 8 F.3d 1253, 1255 (7th Cir. 1993).

certain risks of treating hemophiliacs with factor concentrates and failure to research and develop a viral inactivation process that would have made factor concentrates safer. Both parties treat the duty to warn claims as negligence claims, as will I. *See Ward v. K Mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990) (applying traditional negligence standards in failure to warn case).

To recover for negligence under Illinois law, a plaintiff must prove that the defendant was under a legal duty to exercise care in favor of the plaintiff, that the defendant breached that duty, and that the defendant's breach of its duty was the proximate cause of the plaintiff's injury. *Advincula*, 678 N.E.2d at 1015. The existence of a defendant's duty is a question of law, *Ward*, 554 N.E.2d at 226, but whether there was a breach and proximate cause are jury questions, *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992).

## A. Duty

The defendants argue that they owed no duty to Mr. Erickson to protect or warn against HCV or HIV because there was no medical consensus when he was infected that the viruses were transmissible through factor concentrates, and therefore his injuries were unforeseeable. The question for duty, however, is not whether the particular injury suffered was foreseeable, but whether there is a risk of harm to the plaintiff that is foreseeable. *Slager v. Commonwealth Edison Co., Inc.*, 595 N.E.2d 1097, 1103 (Ill. App. Ct.

1992). This is the "foreseeable plaintiff" inquiry from *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99 (N.Y. 1928). *See Cunis v. Brennan*, 308 N.E.2d 617, 618 (Ill. 1974). That is, the foreseeability of the "initial contact" with the plaintiff, not the type of injury, is what matters in determining whether a duty exists. *Colonial Inn Motor Lodge, Inc. v. Gay*, 680 N.E.2d 407, 413 (Ill. App. Ct. 1997). Moreover, duty is more than mere foreseeability; I must also consider factors such as "the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden upon the defendant." *Lee*, 605 N.E.2d at 501; *cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947).

Mr. Erickson was a foreseeable plaintiff. The defendants knew that viruses like HBV could be transmitted through factor concentrate, and that some of the viruses caused serious, even fatal diseases. Factor concentrate is a product specifically manufactured for use by hemophiliacs, so the foreseeability of an "initial contact" with Mr. Erickson is clear. *See Needham v. White Labs., Inc.*, 847 F.2d 355, 357 (7th Cir. 1988) (finding that risk of harm was clear where defendants "should have known that estrogen could cause some harm to the fetus, and immaterial whether the harm took the form of cancer, let alone a specific cancer such as clear-cell adenocarcinoma."). Neither party offers evidence on the cost to defendants of placing the duty on them, but as medical

manufacturers, they were in a distinctly better position to prevent injury from their products than was Mr. Erickson, the consumer. *See generally* Guido Calabresi, *The Costs of Accidents: A Legal and Economic Analysis* 135-73 (1970) (advocating apportionment of risk to the least cost avoider). The likelihood of the injury is more difficult to assess, however, in light of the dispute over what was known about the existence of HCV and HIV, their modes of transmission, and the consequences of infection. In any event, the defendants acknowledge they were aware of the risks of hepatitis associated with factor concentrate as early as 1972, and that the likelihood of some form of viral hepatitis infection was as high as 50% with factor concentrates. Therefore I conclude as a matter of law that the defendants owed a duty to Mr. Erickson.

### B.  Standard of Care

Ordinarily, a manufacturer is held to a duty of reasonable care, *see Eaves v. Hyster Co.*, 614 N.E.2d 214, 217 (Ill. App. Ct. 1993), but the parties agree that, as processors of blood-based medicines, the defendants were under a duty to act as reasonably prudent professionals, *see Advincula*, 678 N.E.2d at 1021. Professionals must act with "the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." *Id.* at 1020. The plaintiff has the burden of establishing the standard of care through expert testimony based on recognized standards of competency in the

profession. *Id.* at 1021. What the standards are and whether they
were met are questions for the jury. *Jones v. Chicago HMO Ltd. of
Ill.*, 730 N.E.2d 1119, 1129 (Ill. 2000). Under the "learned
intermediary" doctrine, which the parties agree applies to the
defendants, a manufacturer has a duty to warn only the treating
physician, who in turn has a duty to convey those warnings to the
patient. *See Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 352, 354
(Ill. 1996). A medical manufacturer need not provide a warning of
risks that are known to the medical community. *Proctor v. Davis*,
682 N.E.2d 1203, 1211 (Ill. App. Ct. 1997). However, the
defendants, as pharmaceutical manufacturers are

> held to the standard of an expert in the field and [have] a
> "*continuous duty* . . . to warn physicians of the dangers
> incident to prescribing the drug, to keep abreast of
> scientific developments touching upon the manufacturer's
> product and *to notify the medical profession of any additional
> side effects discovered from its use.*"

*Id.* (citations omitted) (emphases in original). A manufacturer may
be liable for failing to warn about risks of which it *should have*
known in addition to those of which it knew. *Id.* at 1211. What
the defendants as professional manufacturers of blood products knew
or should have known and what was well known in the practicing
medical community are questions of fact, not law, to be established
through expert testimony. *Advincula*, 678 N.E.2d at 1021.

The defendants argue that they were under no duty to warn of
the risk of HCV transmission because the risk of hepatitis from

-11-

blood products was well known in the medical community. Indeed, Baxter's package inserts from 1977 to 1979 did contain a warning about the risk of hepatitis from factor concentrate. The particular risk about which Ms. Erickson claims the defendants should have warned, however, is the relatively high risk of contracting hepatitis from pooled products like factor concentrate as opposed to single-donor products like cryoprecipitate. Ms. Erickson offers the opinions of James Mosley, M.D., to establish what the medical academic and research community knew and what experts in the field should have known about the relative infectivity of factor concentrate and cryoprecipitate.

The defendants argue that, at the time of Mr. Erickson's infection, Hepatitis C and "AIDS [were] unforeseeable." It is undisputed that the first known case of AIDS in a hemophiliac was reported in 1982, a year after Mr. Erickson's experts say he was infected with HIV. The defendants argue that there was no "medical consensus" that HIV was transmissible by blood or blood products, but that is not material because Illinois courts have held that a pharmaceutical manufacturer does "not fulfill [its duty as an expert] merely by waiting for what it considered sufficient proof of a cause-effect relationship before advising the medical profession with an appropriate alert or warning of the possibility of risk in the use of one of its products." *Proctor*, 682 N.E.2d at 1211-12. Ms. Erickson offers testimony of Thomas London, M.D., to

-12-

show that, although HCV and HIV had not yet been definitively isolated and identified, experts in the field should have known of the risk of other blood- and plasma-borne viruses that could cause serious liver damage and other diseases.

Ms. Erickson also argues that the defendants breached their duty of professional care by failing to develop a viral inactivation process. Manufacturers have a duty to make their products reasonably safe, *Anderson v. Hyser Co.*, 385 N.E.2d 690, 692 (Ill. 1979), and the foreseeability of harm is a factor in this determination. The defendants challenge the admissibility of Dr. Mosley's and Dr. London's opinions under Fed. R. Evid. 702, which permits an expert "qualified by knowledge, skill, experience, training, or education" to testify about "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue," and if the testimony (1) is based on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) reliably applies those principles and methods. The basic framework from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which requires me to consider both the reliability of the opinion and whether it would be helpful to the trier of fact, is unchanged by recent amendments to the rule. Fed. R. Evid. 702 advisory committee notes, 2000 Amendments.

-13-

Dr. Mosley and Dr. London are both epidemiologists who specialize in blood-borne diseases, particularly hepatitis and HIV. The defendants argue that Dr. Mosley is unqualified to testify about Mr. Erickson's treatment or the motivations of the community of physicians treating hemophiliacs because he never treated Mr. Erickson or any other hemophiliacs, and they argue that neither Dr. Mosley nor Dr. London is qualified to testify because neither has ever been in the business of manufacturing blood products or running a blood bank. The notion that *Daubert* and Rule 702 require an expert to have "particular credentials . . . is radically unsound." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 590 (7th Cir. 2000). Rule 702 contemplates that an expert may be qualified by "knowledge, skill, experience, training, *or* education," and "practical experience is not *essential* to expert testimony." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998) (emphasis in original). An expert witness may form opinions by studying or observing the work of others rather than through first hand participation. *Wetherill v. University of Chicago*, 565 F. Supp. 1553, 1563-64 (N.D. Ill. 1983) (Shadur, J.). Dr. Mosley is not precluded from testifying merely because this case is about a hemophiliac; his opinions are offered to establish the general knowledge in the medical community about transmission of blood-borne viruses, and what manufacturers like the defendants

should have told treating physicians.[4]  Dr. London is qualified to testify about what experts in the field knew or should have known about the potential for other viruses to be transmitted through factor concentrate.

The defendants argue that Dr. Mosley's opinions about the relative risks of cryoprecipitate versus factor concentrates are irrelevant because the question presented in this case is whether the defendants adequately warned about the risk of hepatitis.  But the standard of care that Ms. Erickson seeks to impose would require the defendants to warn of the *relative* risk of infectivity of cryoprecipitate versus factor concentrates, not merely the risk of hepatitis generally.  Dr. Mosley never spoke with Mr. Erickson or his treating physicians about the decision to use factor concentrates rather than cryoprecipitates.  Although Rule 702 requires that any application of principles and methods to the facts of the case be reliable, the drafters specifically contemplated that "it may be important in some cases for an expert to educate the fact finder about general principles, without ever attempting to apply these principles to the specific facts of the case."  Fed. R. Civ. P. 702, advisory committee notes, 2000

---

[4] Apart from the question of qualification, however, Dr. Mosley does not provide any basis, reliable or otherwise, for his opinion that factor concentrate manufacturers failed to warn about the relative risk of infectivity "due to their financial interest." He is barred from offering this opinion. *See DePaepe*, 141 F.3d at 720.

Amendments. Dr. Mosley's opinions about the relative risks of treatment with factor concentrate versus cryoprecipitate are relevant, and the defendants do not challenge their reliability.

Much of Dr. London's testimony relates to knowledge of viruses that are transmitted through whole blood; the defendants argue that his opinions are irrelevant because factor concentrate is made from plasma, not from whole blood. But Dr. London says that, in the early 1970s when he was conducting research to discover blood-borne viruses other than HBV, epidemiology experts knew that unidentified viruses were transmitted though blood and caused serious diseases, including cancer. He and his colleagues assumed, based on the presence of HBV in factor concentrate made from plasma, that if a virus could be transmitted through blood, there was a "high likelihood" that it could also be transmitted through plasma products. The defendants dispute this assumption as a factual matter, but do not suggest that the methodology in arriving at it was unreliable. "[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The defendants also argue that Dr. London's so-called "viral risk opinion" (that the 1970s were the "golden age" of virus discovery and scientists were concerned about transmission of

unidentified blood-borne viruses) is unreliable because there was no consensus in scholarly articles in the 1970s to support it. The defendants cite no authority to support the notion that "consensus" is the touchstone of reliability under Rule 702. The Supreme Court expressly rejected the notion that "general acceptance" was the test for admitting expert testimony when it abandoned the *Frye* test. *Daubert*, 509 U.S. at 589. The defendants argue, further, that Dr. London fails to cite scientific articles in support of his opinions, and that he merely applies his own experience in the field to determine what the knowledge and skill of a professional blood banker ought to have been. Reference to scholarly, peer-reviewed articles is but one of the factors of reliability, and no one factor is determinative. *See* Rule 702, advisory committee notes, 2000 Amendments. I may also consider whether, as here, the expert's opinions "grow[] naturally and directly out of research they have conducted independent of the litigation." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). Dr. London's opinion is based on his experience as a viral epidemiologist. I have already determined that the experience of defendants' experts was a reliable basis for testimony about what was generally known in a particular medical field. *See Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 1001 (N.D. Ill. 2001). Differences of reliable expert opinions are for the jury to resolve. *Smith*, 215 F.3d at 718.

-17-

In the context of the motion to bar Dr. London's opinions about what was known or knowable about HIV and HCV prior to Mr. Erickson's infections, the defendants make two substantive arguments about the standard of care. In a footnote in their reply brief, they argue that Ms. Erickson's claims are preempted by federal law, *viz.*, FDA approval and regulations of factor concentrates. Not only do the defendants mischaracterize the holding of *Buckman Co. v. Plaintiffs' Legal Comm.*, 121 S.Ct. 1012, 1017 (2001) (holding that "state-law fraud-on-the-FDA claim[]" was preempted by federal law based on "uniquely federal" nature of regulated relationship), they waive the argument by putting it in a footnote, *see Border v. City of Crystal Lake*, 75 F.3d 270, 274 (7th Cir. 1996), and waiting to raise it until a reply brief, *see Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 n.9 (7th Cir. 1999). The same applies to the defendants' argument, made in reply, that they were under no duty to warn of the risk of HIV and HCV because, if it was foreseeable to the defendants, it was foreseeable to the medical community as a whole.

C.   Breach

Whether the defendants breached their duty of care is a question of fact, *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992), and the defendants argue that the plaintiff has failed to come forward with any evidence to support this element. The defendants largely bootstrap their arguments on duty and the

-18-

standard of care, but they do not identify any undisputed facts that would entitle them to judgment as a matter of law on this element.  As to the duty to warn, the plaintiff produces a representative package insert that was included in factor concentrates, which warns that the product is made from pooled plasma which "may contain the causative agent of viral hepatitis. . . . The concentrate has not been subjected to any treatment known to diminish the risk of hepatitis transmission since such treatments greatly increase the loss of AHF activity during preparation."  If a jury concluded, on the basis of Dr. London's and Dr. Mosley's testimony, that the defendants had a duty to warn of the relative risk of infection of concentrate versus cryoprecipitate or the risk of infection from unidentified viral agents, it could reasonably conclude that this warning, which makes no mention of the relative risk of pooled plasma versus single-donor products, breached that duty.

As evidence of breach of the duty to manufacture a reasonably safe product, the plaintiffs offer testimony of Dr. Mosley that Baxter did not engage in any viral inactivation efforts until 1979, and even then they only devoted minimal resources.  The defendants respond that the plaintiffs have not proved that any viral inactivation process was feasible, but Dr. Mosley suggests that heat treatment could have been used.  This is sufficient to create a question of fact about whether factor concentrate was

-19-

unreasonably dangerous. *See Sanchez v. Bock Laundry Mach. Co.*, 438 N.E.2d 569, 572 (Ill. App. Ct. 1982). The defendants argue that Ms. Erickson has failed to come forward with any evidence suggesting that they failed to comply with relevant FDA regulations. Evidence of compliance with regulations is evidence, but not conclusive, of due care. *See Advincula*, 678 N.E.2d at 1027.

Ms. Erickson also offers a report by the Institute of Medicine ("IOM") entitled "HIV and the Blood Supply: An Analysis of Crisis Decisionmaking" (1995), as evidence of breach. The report is not attached to Ms. Erickson's response or to her statement of facts; instead, she "respectfully incorporates" her response to the defendants' motion in limine which seeks to exclude the report. Ordinarily, I frown on such transparent efforts to evade page limits, but the defendants do not object, so I will consider the IOM report and the defendants' objections to it in deciding this motion.

Ms. Erickson argues that the report, although hearsay, is admissible under Fed. R. Evid. 803(8)(C), which says that "[r]ecords, reports, statements, or data compilations . . . of public offices or agencies" are admissible if they set forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The parties agree that, although the IOM is not itself a public office or

agency, the report was commissioned by Congress. Because it was commissioned by the government, it was "made pursuant to authority granted by law."

Although it is necessary under Rule 803(8)(C) for factual findings by a non-government entity to be made pursuant to governmental authority, it is entirely separate from the requirement that the report be "of" a public office or agency. The Seventh Circuit held that a report of a private eyeglass manufacturer generated at the direction of an FBI agent was inadmissible under Rule 803(8) because it was not a record of a public entity, and the manufacturer was under no legal duty to generate it. *United States v. Blackburn*, 992 F.2d 666, 672 (7th Cir. 1993). This case is distinguishable: the IOM and its parent organization, the National Academy of Sciences ("NAS"), are private entities, but the NAS was created by an Act of Congress specifically to conduct investigations for, and report to, Congress. 36 U.S.C. §§ 251, 253. Unlike the private manufacturer in *Blackburn*, the NAS is a "quasi-public entity," *see Public Citizen v. Department of Justice*, 491 U.S. 440, 460 (1989), created to assist the government, and it was performing that function in this case. The IOM has a legal duty to provide reports "whenever called upon by any department for the Government," 36 U.S.C. § 253, and it is this duty to report that provides the indicia of reliability commensurate with a public entity, *see* Michael H. Graham, *Federal*

-21-

*Practice & Proc.: Evid.* § 7049, at 476 (Interim ed. 2000). *See also Gilbrook v. City of Westminster*, 177 F.3d 839, 848, 858 (9th Cir. 1999) (treating a report generated by a citizens' committee appointed by city council as public record under Rule 803(8)(C)). The IOM report is therefore a report of a public office or agency.

The defendants suggest that the IOM report is biased and therefore untrustworthy, but these arguments are without merit. They point to the preface of the report, in which the editors note that many hemophiliacs felt "betrayed" by the medical community and "faced considerable suffering and emotional and financial hardship as a result" of treatment with HIV-contaminated blood products. Possible bias is a factor to be considered "when reports are prepared with a view to possible litigation," *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988), but there is no evidence suggesting that is the case here. That the editors refused to answer questions about the process of drafting the report is likewise no indicia of untrustworthiness -- the questions asked by the defendants did not go to the reliability of the report's research methodology, but concerned rather the identity of the drafters and their choice of language. Political bias goes to the weight of the report as evidence, not its admissibility, and it may be explored on cross-examination. *See Ellis v. International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984).

The defendants also argue generally that the IOM report contains multiple levels of hearsay, but they do not identify specific statements. I will not rule on this issue in a vacuum; instead, I reserve ruling on specific objections until they are presented to me. The report is admissible under Rule 803(8)(C), subject to any such individual hearsay objections. Although Ms. Erickson never identifies the portions of the report on which she relies,[5] the defendants identify at least one of the pertinent conclusions: that "plasma fractionators did not seriously consider alternative inactivation processes" and that "[i]n the Committee's judgment, heat treatment processes to prevent the transmission of hepatitis could have been developed before 1980." IOM report at 95. The defendants argue that experts in the field have rejected this conclusion, but that is evidence a jury is entitled to weigh.

### D. Proximate Cause

Proximate cause encompasses two concepts: cause in fact and legal cause. *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). Causation is a question for the jury to decide unless, viewing the facts in the light most favorable to Ms. Erickson, no jury could reasonably conclude that the defendants' conduct was a cause of Mr. Erickson's injuries or death. *Thacker v. UNR Indus., Inc.*, 603 N.E.2d 449, 455 (Ill. 1992).

---

[5] Indeed, neither party attaches the complete IOM report, though the defendants tell me that it consists of 235 pages of text and over 100 pages of appendices.

## 1.  Cause in Fact

There are two fundamental causation questions in this case: what caused Mr. Erickson's injuries and who caused them.  Cause in fact exists when the defendant's conduct was a material element and substantial factor in bringing about the plaintiff's injury.  *Lee*, 605 N.E.2d at 502.  According to his death certificate, Mr. Erickson died of "end stage liver disease due to B and C viral hepatitis."  His physician, Dr. Moor, testified that, at the time of his deposition, there was no way to tell whether Hepatitis B or C was a bigger factor in causing his death, or to differentiate between their relative impact.  Hepatitis C need not be the only cause or even the most significant cause; it need only have been a substantial cause of his injury.  *See Leonardi v. Loyola Univ. of Chicago*, 658 N.E.2d 450, 455 (Ill. 1995).  Dr. Mosley testifies that, in his opinion, Mr. Erickson's HIV infection "potentiated," or accelerated the course of, his hepatitis infections.  The defendants move to bar this opinion because there is nothing in the medical records that says that his HIV infection made his hepatitis worse, and they argue that Dr. Mosley's opinion, supported by medical literature, is not helpful because it is merely "theoretical" and is anyhow inconsistent with the facts of this case.  As I have already determined, an expert may explain principles without applying them or offering an opinion on the ultimate issue, *see Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th

Cir. 2000), so Dr. Mosley's opinions about potentiation are admissible. A reasonable jury could conclude that both HCV and HIV caused Mr. Erickson's injuries, and ultimately his death.

Dr. Mosley also opines about the dates of Mr. Erickson's infections: he says that Mr. Erickson was infected with HCV between September and November 1976, and with HIV in July or August 1981. He bases these opinions on his knowledge of the progression of HCV and HIV infections, the typical symptoms of infection, and the information contained in Mr. Erickson's medical records. The defendants do not challenge the HIV infection date, but they argue that the HCV opinion, which Dr. Mosley modifies in an affidavit based on hospital records that were not previously available, is unreliable because Dr. Mosley relied on the process of elimination and he does not cite articles in support of his opinions. The process of elimination, or "differential diagnosis," is a "technique [that] 'has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results.'" *Lennon v. Norfolk & W. Ry. Co.*, 123 F. Supp. 2d 1143, 1153 (N.D. Ind. 2000) (Lee, C.J.); *Wsol v. Great N. Asset Mgmt., Inc.*, 114 F. Supp. 2d 720, 726 (N.D. Ill. 2000) (Bucklo, J.) (noting that Mill's Methods, including the process of elimination, are reliable scientific methods). The defendants also suggest that Dr. Mosley's change in opinion based on new records makes all of his opinions unreliable, but this is frivolous. The

failure to cite scholarly articles does not render his opinions unreliable in light of his experience in this field; one would hope that a trained epidemiological expert need not consult a journal to discuss the symptoms of hepatitis or HIV. Dr. Mosley's date of infection opinions are admissible.

On the question of *who* caused the injuries, Ms. Erickson offers a summary chart of Mr. Erickson's factor treatments as evidence that the defendants manufactured the concentrates that infected him. Dr. Mosley identifies three treatments in September and November 1976 when Mr. Erickson received Baxter products from Children's Memorial Hospital that correspond with his opinions about the HCV infection. On the basis of the plaintiff's evidence, no reasonable jury could conclude that Mr. Erickson's HCV infection was caused by products of Armour or Bayer, so I GRANT summary judgment for them on the claims arising out of that injury.

Dr. Mosley also identifies four dates in July and August 1981 when Mr. Erickson received treatments at Children's Memorial that correspond with the proposed date of HIV infection, but the records do not indicate the manufacturer of those treatments. As evidence of actual cause, Ms. Erickson purports to rely on "the units administered to [Mr.] Erickson in August 1981, the unit doses produced by Baxter and Bayer, and the shipments of product in those doses from Baxter and Bayer to Children's Memorial Hospital." Ms. Erickson attempts to invoke "alternative liability" to establish

actual cause for the HIV infection. The Illinois Supreme Court has acknowledged, but not specifically adopted, the theory of alternative liability, which shifts the burden to each defendant to prove its innocence where all possible tortfeasors are joined as defendants. *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 329, 339-40 (Ill. 1990). Alternative liability only applies where the "all defendants who could have possibly injured the plaintiff are before the court." *Wysocki v. Reed*, 583 N.E.2d 1139, 1144 (Ill. App. Ct. 1991) (citations omitted).

The defendants argue that not all possible defendants have been joined because at least nine companies manufactured factor concentrates in the relevant time period. The plaintiff denies this, but she does not come forward with any evidence to suggest that she has joined all *possible* defendants. The defendants' evidence is testimony from an Armour employee naming its eight competitors who manufactured factor concentrates in 1974. Ms. Erickson's response to the defendants' statement of facts contains no reference to evidence; it merely points out what the defendants' evidence does not prove: that all nine of those manufacturers sold factor concentrate to Children's Memorial Hospital in 1976 and 1981.[6] Ms. Erickson offers a chart summarizing Mr. Erickson's

---

[6] Ms. Erickson's response to defendants' paragraph 19 is not a denial under Local General Rule 56.1(b)(3)(A) because she does not come forward with evidence to rebut it, so the defendants' statement is deemed admitted. Ms. Erickson moves to strike defendants' paragraph 19 on the grounds that the cited testimony

medical records and indicating the dates and purposes of his treatments with blood products. She includes the lot number and manufacturer when available. The chart lists products from Baxter, Bayer and Alpha,[7] but none from Armour, or any of the five other manufacturers. There is no manufacturer given for nearly half of the listed treatments, and even viewing the chart in the light most favorable to Ms. Erickson, as I must for the purposes of this motion, I cannot conclude that *all possible* defendants are joined as defendants here. *Cf. Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 640 (7th Cir. 1995) (applying alternative liability where plaintiff identified manufacturer for every factor concentrate treatment received). Without alternative liability, there is no evidence connecting Armour with any of treatments received by Mr. Erickson, so I GRANT summary judgment on the HIV claims against Armour. However, the evidence that both Baxter and Bayer supplied their products to Children's Memorial in the time surrounding Mr. Erickson's HIV infection is sufficient to create a question of fact, even without alternative liability.

---

does not support it, but it does, so her motion is denied. Of course, Ms. Erickson is quite right that the defendants' statement in paragraph 19 that there were nine manufacturers of factor concentrate in 1974, even if true, is not conclusive evience that all nine manufacturers are possible defendants in this action because it does not relate to the time period in question. The disposition of these motions only highlights the futility of motions to strike statements and responses under Local Rule 56.1.

[7] Alpha is no longer a defendant in this case.

## 2. Legal cause

The essence of legal cause is foreseeability of the injury: the plaintiff's injury must be of a type that a reasonable person would see as a likely result of his conduct. *Lee*, 605 N.E.2d at 503. There may be more than one proximate cause of an injury; under Illinois law of comparative negligence, the finder of fact must make the final determination of who is responsible for Mr. Erickson's injury and to what extent. *See Slager v. Commonwealth Edison Co., Inc.*, 595 N.E.2d 1097, 1105 (Ill. App. Ct. 1992). The question of foreseeability in the context of proximate cause should be taken from the jury only when the plaintiff's injury is bizarre or freakish, or when it would be unwise as a matter of policy to hold the defendants accountable. *Colonial Inn Motor Lodge, Inc. v. Gay*, 680 N.E.2d 407, 415 (Ill. App. Ct. 1997); *Nelson v. Commonwealth Edison Co.*, 465 N.E.2d 513, 519 (Ill. App. Ct. 1984).

Under the learned intermediary doctrine the manufacturer's duty to warn runs to the physician, so the defendants argue that the causal chain is broken because Ms. Erickson cannot show that Mr. Erickson's doctors were not independently aware of the risk, or that they would not have treated him the same way even if they knew the risk. This merely repeats the defendants' arguments about the standard of care and presumes that adequate warnings were given, a question that I have already said cannot be resolved here. In any event, the plaintiffs are entitled at this stage to a presumption

that a learned intermediary would have heeded the warnings given. *See Mahr v. G.D. Searle*, 390 N.E.2d 1214, 1233 (Ill. App. Ct. 1979).

The defendants seek to bar Dr. Mosley's opinion that Mr. Erickson, a mild hemophiliac, could have been treated with cryoprecipitate rather than with factor concentrate. They argue that Dr. Mosley is not qualified to offer that opinion because he is not an expert hematologist, has not treated a hemophiliac since he was in medical school, and never treated Mr. Erickson personally. It is not conclusive that Dr. Mosley never treated Mr. Erickson personally, *see Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000), or even that he is not a hematologist. As a member of the Transfusion Safety Study, Dr. Mosley worked with hemophilia treaters, and was familiar with hemophilia literature and therapy options, but he testified that he did not consider himself an expert in this field, so he is not qualified to offer this opinion. *See Lieberman v. American Dietetic Ass'n*, No. 94 C. 5353, 1996 WL 521176, at *2 n.1 (N.D. Ill. Sept. 9, 1996) (Bucklo, J.). In any event, "[w]hat a physician might or might not have done had he been adequately warned is not an element the plaintiff must prove as part of her case." *Noyola v. Johnson & Johnson*, No. 85 C 2184, 1986 WL 14657, at *4 (N.D. Ill. Dec. 16, 1986) (Hart, J.) (citing *Mahr*, 390 N.E.2d at 1233).

Mr. Erickson's mother, Karen Bain, said that she was aware of the risk of hepatitis from the time that her sons were diagnosed with hemophilia, and that it would not have made a difference in her treatment decisions if she had known about the risks of hepatitis B versus C. Ms. Bain's testimony does not address what her decision would have been if she had known that Mr. Erickson was twenty-five to fifty times more likely to contract hepatitis from factor concentrate than he was from cryoprecipitate; a jury could certainly conclude that, if given full information, she would have chosen the safest treatment available. Moreover, assumption of the risk is merely a partial bar to recovery under Illinois' comparative negligence system. *Coney v. J.L.G. Indus., Inc.*, 454 N.E.2d 197, 204 (Ill. 1983).

Finally, the defendants cite to factual findings of other courts to support their argument that I should find that HIV was unforeseeable as a matter of law. I may rely on the legal conclusions of other courts, but not on their factual findings in the absence of collateral estoppel. *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 381 (9th Cir. 1992); *Lewis v. Washington*, 197 F.R.D. 611, 615 (N.D. Ill. 2000) (Bucklo, J.). The undisputed evidence in this case is that there was no consensus that HIV was transmitted via blood until 1984.[8] To require consensus in the

---

[8] Ms. Erickson denies defendants' statements of fact to this effect, but she does not provide references to any evidence to support the denial, so they are admitted. L.R. 56.1(b)(3)(B).

medical community, however, would rule out liability for all harms but those that are certain to happen, rather than those that are reasonably foreseeable. *See Colonial Inn Motor Lodge*, 680 N.E.2d at 416. The plaintiffs have come forward with evidence of what the medical and scientific community knew about HCV and HIV prior to Mr. Erickson's infection from which a reasonable jury could conclude that his HIV and HCV infections were reasonably foreseeable.

## V. Conclusion

The defendants' motions to bar Drs. Mosley and London are DENIED IN PART and GRANTED IN PART to the extent that I have indicated in this opinion. Both parties included substantive arguments on the merits of Ms. Erickson's claims in the memoranda on these motions, many of which were omitted from the memoranda on the motion for summary judgment. Although I have indulged these arguments in many instances because there was no objection, the parties should not rely on me to comb the record, including other motions, for evidence and arguments to support their claims. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). The parties also bring cross-motions to strike that are particularly appalling: the defendants ask me not to strike certain of their exhibits, but ask that I strike identical exhibits of the plaintiff. The plaintiff's objections to the form of the defendants' exhibits for lack of authentication are meritless, *see*

Fed. R. Evid. 902(c) (self-authentication of newspapers and periodicals); the defendants' adoption of these baseless arguments to achieve some sense of tit-for-tat fairness or to punish Ms. Erickson for not withdrawing her motion does not improve them. Both motions are DENIED. The motion for summary judgment is DENIED as to all claims against Baxter; GRANTED as to all claims against Armour; and GRANTED as to the hepatitis claims and DENIED as to the HIV claims against Bayer.

ENTER ORDER:

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated:     July 16, 2001